DECISION AND JOURNAL ENTRY
{¶ 1} Defendant/Appellant, Janet Burt, appeals her conviction in the Summit County Court of Common Pleas. We affirm.
 {¶ 2} On August 10, 2007, Defendant was indicted on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) and (B)(1), a first-degree felony (count 1); six counts of theft in violation of R.C. 2913.02(A)(3), fifth-degree felonies (counts 18, 24, 30, 32, 36, 37); one count of petty theft in violation of R.C. 2913.02(A), a first-degree misdemeanor (count 19); and receiving stolen property in violation of R.C. 2913.51(A), a fifth-degree felony (count 58). The charges stemmed from the activities of Vera Strong, a former employee of the Ohio Department of Taxation who altered Defendant's and her co-defendants' tax returns to provide them a larger tax refund for which Strong was paid a fee. On February 8, 2008, Defendant was convicted of counts 1, 18, 19, 24, 30, and 36 and found not guilty of counts 32, 37, and 58. Defendant was sentenced to three years of incarceration on each felony *Page 2 
conviction to run concurrent with each other and with ninety days of incarceration on the misdemeanor conviction. The sentence was suspended and Defendant was placed on three years of community control. Defendant timely appealed and raises one assignment of error.
 Assignment of Error
"[Defendant's] convictions were against the manifest weight of the evidence."
 {¶ 3} In her sole assignment of error, Defendant argues that her convictions were against the manifest weight of the evidence. Defendant maintains that there was no evidence that she knew "that Strong was involved in illegal activity." Accordingly, Defendant maintains, she cannot be found guilty of theft and the conviction for engaging in a pattern of corrupt activity, which was based on the theft convictions, must also be reversed.
 {¶ 4} When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power may only be invoked in extraordinary circumstances if the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 5} Defendant was convicted of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) and (B)(1), which state that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt" and "[w]hoever violates this section is guilty of engaging in a pattern of corrupt activity." *Page 3 
 {¶ 6} Defendant was also convicted of theft and petty theft in violation of R.C. 2913.02(A)(3), which states that, "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception[.]" "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 7} The jury heard the testimony of eight witnesses. Defendant did not testify.
 {¶ 8} Strong testified that she had been employed by the Ohio Department of Taxation but was forced to resign when the department found out that she "had been making it possible for friends and family to receive additional state refunds." Strong testified that she had known Defendant for twenty years, that Defendant had loaned her money over the years, and that they were "great friends." Strong testified that on September 26, 2005, she amended Defendant's 2004 state income tax return to show that Defendant had paid $988 in tax rather than $488 in tax thereby allowing for a $500 distribution to Defendant. Strong explained that the amendment was filed electronically and the refund was distributed to Defendant one week later. Strong also identified a letter that the Department of Taxation automatically generates to taxpayers when an adjustment is made to an individual's tax return and explained that this type of letter is called a "variance letter." Strong explained that the variance letter contained two columns indicating the original filing numbers and the amended filing numbers.
 {¶ 9} Strong testified that because she knew Defendant was having financial problems she suggested to Defendant that she "would make it possible for her to receive an additional state income tax refund" and Defendant agreed. Strong stated that Defendant agreed to pay her $100 *Page 4 
in exchange for her services and that she went to Defendant's home to pick up her payment. Strong testified that she also amended Defendant's 2003 tax return and was paid in much the same manner.
 {¶ 10} Strong testified that she knew co-defendant Vicki Squibbs through Defendant and her only association with Squibbs was through Defendant. Strong explained that Squibbs was Defendant's son's one-time girlfriend and the mother of Defendant's grandson. Strong testified that she altered more than one of Squibbs's tax returns after Defendant told her that Squibbs had received tax refunds. Strong explained that she obtained Squibbs's W-2s from Defendant and that she altered the tax returns to increase Squibbs's tax refunds. Strong testified that the address listed as Squibbs's address on the amended returns was Defendant's address. Strong stated that the variance letters and the refund checks would have been mailed to Defendant's address. Strong testified that Defendant paid her $100 each in cash for making the adjustments and that it was her belief that Defendant was also going to get a portion of the refund. Strong finally testified that she never spoke to Squibbs about the transactions.
 {¶ 11} Strong testified that she knew co-defendant Cherie Burt as Defendant's daughter. Strong testified that she made adjustments to Burt's income tax returns in much the same way as previously testified after Defendant told her that Burt needed money. Strong stated that the refunds and variance letters would have been mailed to Defendant's address and that she obtained Burt's W-2s from Defendant. Strong testified that she only spoke to Burt once, when Burt was present at Defendant's home on the day Strong came to collect a payment.
 {¶ 12} Strong finally testified that Defendant "knew absolutely nothing as to how I was going to make it possible for her to receive an additional refund. She knew I was doing it, but she didn't know the mechanics of how it was to be done." Strong indicated that she did not *Page 5 
know what she was doing was illegal and that she did not tell Defendant that what she was doing was illegal. Strong stated that she did not think Defendant would have allowed her to do it if she had known it was illegal. Strong finally stated that she although she considered Defendant a highly-educated woman, she did not know if she would have understood the content of the variance letters.
 {¶ 13} Various witnesses from the Ohio Department of Taxation testified as to the investigation of Strong and the adjustments made to the various tax returns.
 {¶ 14} Trooper Rick Wells testified that he investigated this matter and interviewed Defendant. Wells stated that Defendant told him that she and Strong were good friends and that Strong had, at one time, prepared her tax returns. Wells identified the refund check and direct deposit form that he showed to Defendant during her interview. Wells indicated that Defendant told him that she received the funds and identified her signature on the back of the check. Wells also identified Defendant's bank statements showing deposits for Defendant's and Squibbs's refunds and noted that there was not a withdrawal equal to the amount of Squibb's refunds. Wells indicated that Defendant admitted to making small payments to Strong and stated that the two lent money back and forth. Wells stated that Defendant told her that she asked Strong to do her taxes because she needed money quickly, but that the records did not indicate that Strong prepared Defendant's original returns. Wells finally testified that Defendant explained that someone named Mary told her about additional tax refund funds available and that she then went to Strong to ask her about it. Defendant told him that Strong told her that such funds were available and that she would help Defendant obtain them. Wells stated that Defendant told him she thought the refund money was from an unclaimed funds account. Wells testified that *Page 6 
Defendant did not deny that the refunds were fraudulent and stated that Defendant's facial expression did not change when confronted with the potential charges.
 {¶ 15} With regard to Squibbs's tax refunds, Wells explained that Defendant told him that Squibbs was "on the run from the law" and that she would cash Squibbs's checks for her.
 {¶ 16} Wells also spoke with Burt who identified her signatures on the back of two refund checks and acknowledged that she received variance letters. Burt indicated that prior to cashing the checks, she verified their legitimacy by speaking with a man identified as "Mike at the Federal Building." Wells testified that Burt "was visibly shaking and her voice was wavering" during their interview and that he could not locate a man named Mike.
 {¶ 17} Burt testified that Defendant was her mother and that Strong was her mother's friend. Burt stated that she did not have a relationship with Strong. Burt indicated that she knew Strong worked in the tax department and thought she worked at the Federal building. Burt testified that she had a problem with a tax preparation company in the past and she asked her mother to ask Strong to look at her tax returns because Burt thought Strong was a tax expert. Burt stated that she never spoke to Strong directly. Burt stated she was also aware that Defendant helped Squibbs with her tax problem.
 {¶ 18} Burt indicated that she only received one variance letter related to the second refund and that when she received it, she called the number on the letter and spoke to Mike who verified the refund check after which she cashed it. Burt testified that she would not have cashed the checks if she knew they were generated illegally and would not have let her mother get involved had she known what Strong intended to do. Burt denied paying Strong any money and denied that she knew that Strong had anything to do with the refund checks. Burt also denied speaking to her mother about the refund checks until after the investigation began and she spoke *Page 7 
to Trooper Wells. Burt finally testified that her mother did not receive her refund checks, did not sign them, and received no portion of the refunds.
 {¶ 19} Based on the foregoing, we hold that Defendant's convictions were not against the manifest weight of the evidence. Although Defendant testified that she thought she was simply receiving unclaimed funds, there was ample evidence to establish that checks were being generated based on amended tax returns, not unclaimed funds. Variance letters so indicating were mailed to Defendant. The refund checks were mailed to Defendant's address and/or the refunds were direct deposited into Defendant's account. Moreover, Defendant paid a Ohio Department of Taxation employee (Strong) to obtain funds that, according to Defendant, legally belonged to her, Squibbs, and/or Burt. There was also evidence that it was Defendant who forwarded Squibbs's and Burt's tax information to Strong, processed the refunds, and paid Strong for amending all of the returns. Based on the foregoing, we hold that the fact-finder could conclude that Defendant knew that the tax refunds were being generated illegally. Accordingly, Defendant's convictions for theft and engaging in a pattern of corrupt activity based on those theft convictions were not against the manifest weight of the evidence.
 {¶ 20} Defendant's assignment of error is overruled and the judgment of the trial court is affirmed.
Judgment affirmed.
 The Court finds that there were reasonable grounds for this appeal. *Page 8 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 CARR, P. J. WHITMORE, J. CONCUR. *Page 1